UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **H.C. and J.C., individually and on behalf of M.C.,**<br><br>**Plaintiffs,**<br><br>***- against -***<br><br>**KATONAH-LEWISBORO UNION FREE SCHOOL DISTRICT,**<br><br>**Defendant.** | **09 Civ. 10563 (PED)**<br><br>**MEMORANDUM AND ORDER** |

**PAUL E. DAVISON, U.S.M.J.:**

## I. INTRODUCTION

Plaintiffs H.C. and J.C. (the "Parents") bring this action individually and on behalf of their minor child, M.C. (collectively, the "Plaintiffs"), pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Plaintiffs contend that the Individualized Educational Plan ("IEP") devised by defendant Katonah-Lewisboro Union Free School District ("Katonah," or the "Defendant") for M.C. for her 2008-2009 school year was not reasonably calculated to provide her with a free appropriate public education ("FAPE"). The Parents objected to the 2008-2009 IEP and unilaterally placed M.C. into the Windward School ("Windward"), a private institution for which they paid tuition.

The Parents filed an administrative complaint against Katonah and a hearing was held before an Impartial Hearing Officer ("IHO") appointed by the New York State Board of Education. The IHO found for the Parents and concluded, *inter alia*, that Katonah's IEP failed to provide M.C. with a FAPE. (See generally IHO Decision (Dkt. 13).)[1] Katonah appealed and

---

[1] "IHO Decision" refers to the Decision of IHO Joan B. Alexander, Esq., dated August 3, 2009 (Dkt. 13).

the State Review Officer ("SRO") sustained the appeal and annulled the decision of the IHO. (See generally SRO Decision (Dkt 13).)[2] Plaintiffs now seek federal review of the SRO's administrative decision, along with reimbursement for their private school tuition expense, the costs associated with certain private assessments, and attorneys' fees. Both parties have moved for summary judgment (Dkts. 15, 20).[3] For the reasons set forth below, Plaintiffs' motion is **DENIED**, Defendant's motion is **GRANTED**, and the complaint is hereby **DISMISSED**.

## II. BACKGROUND

### A. M.C.'s Educational and Testing History

#### 1. *Preschool and Kindergarten*

M.C. was born on January 1, 2001. She attended a general education nursery and preschool program during the 2004-2005 and 2005-2006 school years. She attended a general education, half-day kindergarten program in Katonah during the 2006-2007 school year.

##### a. Private Speech-Language Pathologist Assessment

In the fall of 2006, the Parents had M.C. assessed by a private speech-language pathologist. Her report, dated September 20, 2006, set forth the results of several tests she administered to M.C.

*Comprehensive Test of Phonological Processing*

The results of the Comprehensive Test of Phonological Processing revealed that M.C. ranked in the 23rd percentile in phonological awareness; the 16th percentile in phonological

---

[2] "SRO Decision" refers to the Decision of SRO Paul F. Kelly, dated October 26, 2009 (Dkt. 13).

[3] The parties have consented to my jurisdiction for all purposes, including entry of a final judgment, pursuant to 28 U.S.C. § 636(c) (Dkt. 8).

memory; and the 2nd percentile in rapid naming.[4] (See Joint Ex. 1B, at 35 (Dkt. 13).)[5]

*Illinois Test of Psycholinguistic Abilities–Third Edition*

The results of the Illinois Test of Psycholinguistic Abilities revealed that M.C. ranked in the 37th percentile in spoken language; the 14th percentile in general language; and the 4th percentile in written language.[6] The speech-language pathologist recommended "immediate attention" to address M.C.'s "phonological processing skills," which she determined were "all in the deficient range." (Id. at 36.) M.C. began attending speech-language therapy sessions twice a week. (See Tr., at 2495-97 (Dkt. 13).)

*Clinical Evaluation of Language Fundamentals–Preschool*

The results of the Clinical Evaluation of Language Fundamentals assessment revealed that M.C. was in the "superior" to "average" and "mid-average" ranges. Specifically, the test revealed that M.C. ranked in the 95th percentile in sentence structure; the 84th percentile in expressive vocabulary; the 63rd percentile in concepts and following directions; the 98th percentile in word structure; the 37th percentile in recalling sentences; and the 37th percentile in word classes–receptive.[7] (See Joint Ex. 1B, at 37.)

**b. Kindergarten Screening**

---

[4] As noted below, the test was re-administered to M.C. by Katonah's speech-language pathologist in April 2008, as well as by the private psychologist hired by the Parent in the summer of 2008.

[5] All exhibits cited herein are found in Docket 13.

[6] As noted below, the test was re-administered to M.C. by the private speech-language pathologist in May 2008.

[7] As noted below, the Clinical Evaluation of Language Fundamentals–Fourth Edition was administered to M.C. by Katonah's speech-language pathologist in December 2006 and January 2007, as well as in March 2008.

In October 2006, M.C.'s kindergarten teacher and a speech-language pathologist employed by Katonah conducted certain assessments of M.C. At that time, M.C. identified 17 uppercase letters, 16 lowercase letters, 1 sight word, and 2 letter sounds.[8] (See Dist. Ex. 43.) Katonah's speech-language pathologist testified she was concerned about M.C.'s "lack of phonemic awareness, her poor skills in rhyming, letter/sound symbol recognition, [and] fine motor ability." (Tr., at 382.)

Katonah provided building-level reading and speech-language intervention services to M.C. for the remainder of the 2006-2007 school year. A reading specialist employed by Katonah worked with M.C. in a small group in the kindergarten classroom for twenty minutes per session three times a week. The reading specialist testified she utilized the Wilson Fundations reading program and provided these building-level services for the remainder of the kindergarten year. (See id. at 421-27.)

**c. Private Audiologist Evaluation**

The Parents also had M.C. evaluated by a private audiologist. By report dated November 1, 2006, the audiologist diagnosed M.C. with a central auditory processing disorder and recommended, among other things, that M.C. utilize certain assistive technology – specifically, a personal FM system with receivers for each ear – to help her while she was in the classroom. (See Joint Ex. 1B., at 31.) M.C.'s mother notified Katonah in November 2006 of the evaluations conducted by the private speech-language pathologist and audiologist. M.C. was then referred to Katonah's Committee on Special Education. (See Dist. Ex. 20.)

**d. Katonah's Speech-Language Pathologist Assessment**

---

[8] As noted below, M.C.would be re-assessed several times with respect to letter and word recognition.

In December 2006 and January 2007, Katonah's speech-language pathologist conducted further evaluations of M.C.

*Clinical Evaluation of Language Fundamentals–Fourth Edition*

Katonah's speech-language pathologist assessed M.C. using the Clinical Evaluation of Language Fundamentals–Fourth Edition. As discussed above, the private speech-language pathologist previously assessed M.C. using the Preschool Edition of this exam in September 2006. The results of the December 2006/January 2007 assessment revealed that M.C. ranked in the 98th percentile in formulated sentences; the 84th percentile in sentence structure; the 75th percentile in expressive vocabulary; the 63rd percentile in both concepts and directions and understanding paragraphs; the 50th percentile in word structure, recalling sentences, and word classes–expressive; and the 25th percentile in word classes–receptive.[9] (See Dist. Ex. 9, at 1.)

*Test of Language Development–Primary: Third Edition*

The results of the Test of Language Development revealed that M.C. ranked in the 91st percentile in both picture vocabulary and relational vocabulary; the 75th percentile in oral vocabulary; and the 63rd percentile in grammatic understanding. (See id. at 2.)

**e. Katonah's Educational Evaluator Assessment**

*Wechsler Individual Achievement Test*

On January 3, 2007, an educational evaluator employed by Katonah assessed M.C. using the Wechsler Individual Achievement Test. The results of this test revealed, among other things, that M.C. ranked in the 47th percentile in spelling; the 45th percentile in math reasoning; and the

---

[9] As noted below, the Fourth Edition of the Clinical Evaluation of Language Fundamentals assessment was again administered by Katonah's speech-language pathologist in March 2008.

37th percentile in both word reading and numerical operations. The educational evaluator determined that each of M.C.'s scores were in the average range. (See id. at 1-2.) She also noted that M.C. demonstrated "average early reading skills and emerging phonemic awareness." (Id. at 2.) She did not recommend academic intervention, but did note that the Parents may consider further evaluations to determine if M.C. had difficulties with concentration and attention. Finally, she noted that M.C. could identify 19 lowercase letters.[10] (See id. at 1-2.)

**f. Kindergarten Teacher Report**

By report dated January 12, 2007, M.C.'s kindergarten teacher noted that M.C. could identify all uppercase letters and 25 lowercase letters. (See Dist. Ex. 84, at 1.)

**g. Katonah's Psychologist Evaluation**

A psychologist employed by Katonah also evaluated M.C. in January of 2007.

*Wechsler Preschool and Primary Scale of Intelligence–Third Edition*

The results of the Wechsler Preschool and Primary Scale of Intelligence revealed that M.C. scored within the "average" range in each of the verbal, performance, and processing speed tests. She also presented with an average IQ. (See Dist. Ex. 53, at 2.)

*Woodcock Johnson Test of Cognitive Abilities–Third Edition*

The results of the Woodcock Johnson Test of Cognitive Abilities revealed that M.C. scored in the 81st percentile in retrieval fluency, the 27th percentile in decision speed, the 7th percentile in cognitive fluency, and the 6th percentile in rapid picture naming. (See id. at 3.) Katonah's psychologist noted that M.C.'s scores in cognitive fluency and rapid picture naming

[10] As noted below, the Wechsler Individual Achievement Test was re-administered by Katonah's resource room teacher and reading specialist in January and April 2008, as well as by the private psychologist hired by the Parents in the summer of 2008.

"should be interpreted with caution" because they reflected M.C.'s abilities under "certain circumstances." (Id. at 5.) She also noted that M.C. lacked motivation and was easily distracted during the test. Overall, she concluded that M.C. had a "solid cognitive profile." (Id.)

**h. 2006-2007 IEP**

Katonah's Committee on Special Education met on January 24, 2007 and determined that M.C. was eligible to receive special education and related services for the remainder of the 2006-2007 school year. Among other things, the 2006-2007 IEP developed by the Committee provided for a thirty-minute session of occupational therapy once a week and a thirty-minute session of speech-language therapy twice a week. It also provided for access to an assistive technological device – an "FM system" – in the classroom. Finally, the IEP listed eight goals for the remainder of M.C.'s kindergarten year. These included speech-language and motor skills goals. The Parents approved the IEP and the services provided for therein. (See Dist. Ex. 3, at 1-2, 6-7.)

**i. 2007-2008 IEP**

On May 16, 2007, the Committee convened for M.C.'s annual review and to develop her IEP for the 2007-2008 school year. It considered, among other things, a report from M.C.'s kindergarten teacher; report cards; observations; evaluations conducted by Katonah's psychologist, occupational therapist, and speech-language pathologist; evaluations conducted by the private speech-language pathologist hired by the Parents; and the tests and scores noted above. The Committee found that M.C. demonstrated progress in auditory processing and direction-following skills, and recommended, among other things, participation in a general education program for first grade, a thirty-minute session of occupational therapy once a week, a thirty-minute session of speech-language therapy twice a week, and access to an FM system.

(See. Dist. Ex. 2.) A report dated June 21, 2007 further advised the parents that M.C. was "progressing satisfactorily" toward four goals listed in the 2006-2007 IEP, had "achieved" two others, and was demonstrating "some progress" towards her motor skills goals. (Dist. Ex. 8, at 2-3.)

### 2. *First Grade*

#### a. Private Summer Day Camp

The Parents sent M.C. to a private day camp in the summer of 2007. M.C. was tutored in reading and writing and received speech-language therapy at the camp.

*Dynamic Indicators of Basic Early Literacy Skills–Sixth Edition*

The day camp tested M.C. using the Dynamic Indicators of Basic Early Literacy Skills reading assessment at the beginning and end of the summer. The sub-tests revealed that M.C. scored in an end-of-kindergarten level in areas of initial sound fluency and phoneme segmentation fluency. The camp's report noted that M.C. appeared to be "at risk" in areas of naming fluency and nonsense word fluency. It recommended M.C. continue practicing blending and reading short, nonsense words. (See generally Parents Ex. E.)

#### b. Katonah's Reading Specialist Assessment

M.C. was re-assessed by Katonah's reading specialist in the beginning of the 2007-2008 school year. At that time, M.C. identified all upper and lowercase letters; identified 23 letter sounds; and scored an 8 out of 24 in phonemic awareness, a 15 out of 26 in high frequency words, an 8 out of 37 in dictation, and a 4 out 4 in concepts in print. (See Dist. Ex. 30, at 1.) The reading specialist testified that she continued to provide M.C. with building-level reading support services using the Wilson's Fundations technique in addition to the services M.C. received pursuant to the 2007-2008 IEP. The reading specialist also testified that she pulled

M.C. out of her first grade classroom for small-group sessions four times a week for thirty minutes per session. (See Tr., at 436, at 441-43.)

*Dynamic Indicators of Basic Early Literacy Skills–Sixth Edition*

Katonah's reading specialist also tested M.C. using the Dynamic Indicators of Basic Early Literacy Skills reading assessment in October 2007, January 2008, and April 2008. In October 2007, M.C. read 5 words correctly and ranked in the 25th percentile; in January 2008, she read 10 words correctly and ranked in the 10th percentile; and in April 2008 she read 29 words correctly and ranked in the 25th percentile.[11] (See Dist. Ex. 52, at 1; see also Tr., at 590-93.) The reading specialist reported that, in her opinion, M.C. made "fabulous progress this year in developing reading skills." (Dist. Ex. 52, at 1.)

*PM Benchmarks*

Katonah's reading specialist also tested M.C. using the PM Benchmarks reading assessment. On November 30, 2007, M.C. was assessed as a level 5 reader with a guided reading level of D and 91% accuracy.[12] On February 15, 2008, she was assessed as a level 6 reader with a guided reading level of D and 98% accuracy. On May 12, 2008, she was assessed as a level 9 reader with a guided reading level of F and 90% accuracy. The reading specialist testified that level B is appropriate for kindergarten, and levels B through I are appropriate levels for first grade. (See id.; see also Tr., at 450-51.)

*DRA Continuum*

The reading specialist also tested M.C. using the DRA Continuum reading assessment.

---

[11] It is not clear how these results compare with those obtained by the summer day camp.

[12] As the SRO noted, the November 2007 PM Benchmark assessment was inconsistently reported as both a guided level "B" and "D." (SRO Decision, at 21 n.28.)

In October 2007, M.C. was assessed as an independent level 2/instructional level 3 reader. In June 2008, she was assessed as an independent level 12/instructional level 14 reader. (See Dist. Ex. 38.)

**d. Katonah's Resource Room Teacher Assessment**

*January 2008 and April 2008 Wechsler Individual Achievement Test*

On January 25, 2008 and April 14, 2008, a resource room teacher employed by Katonah and Katonah's reading specialist re-administered certain portions of the Wechsler Individual Achievement Test, a test that was previously administered to M.C. by Katonah's psychologist on January 3, 2007.[13] The January and April 2008 results revealed, among other things, that M.C. ranked in the 30th percentile in word reading; the 39th percentile in reading comprehension; the 66th percentile in pseudoword decoding; the 13th percentile in numerical operations; the 50th percentile in math reasoning; the 61st percentile in spelling, and the 55th percentile in written expression. (See Dist. Ex. 24, at 1; Dist. Ex. 27, at 1.)[14]

**e. Katonah's Speech-Language Pathologist Assessment**

*March 20, 2008 Clinical Evaluation of Language Fundamentals–Fourth Edition*

On March 20, 2008, Katonah's speech-language pathologist re-administered the Clinical Evaluation of Language Fundamentals, a test that was previously administered to M.C. by the private speech-language pathologist hired by the Parents in the fall of 2006, as well as by Katonah's speech-language pathologist in December 2006 and January 2007. The results

---

[13] The resource room teacher administered certain sub-tests in January and the reading specialist administered others in April. (See Tr., 704-05.)

[14] As discussed below, the test was again administered by a private psychologist hired by the Parents during the summer of 2008.

revealed that M.C. ranked in the 98th percentile in formulated sentences; the 84th percentile in sentence structure; the 91st percentile in expressive vocabulary; the 50th percentile in concepts and directions; the 75th percentile in understanding paragraphs; the 63rd percentile in word structure; the 50th percentile in recalling sentences; the 95th percentile in word classes–expressive; and the 75th percentile in word classes–receptive. Katonah's speech-language pathologist concluded that M.C. presented in the "average to superior range of development" and did not recommend speech-language intervention. (See Dist. Ex. 7, at 1-2.)

*April 16, 2008 Comprehensive Test of Phonological Processing*

On April 16, 2008, Katonah's speech-language pathologist re-administered the Comprehensive Test of Phonological Processing, a test that was previously administered to M.C. by the private speech-language pathologist hired by the Parents in the fall of 2006. The results of this test revealed that M.C. ranked in the 73rd percentile in phonological awareness; the 27th percentile in phonological memory; the 16th percentile in rapid naming; and the 5th percentile in alternate rapid naming.[15] (See Dist. Ex. 22, at 1.)

**f. 2008-2009 IEP**

On May 8, 2008, Katonah's Committee on Special Education convened for M.C.'s annual review and developed her IEP for the 2008-2009 school year. The Committee considered, among other things, teacher reports; report cards; observations; evaluations by both the private and district professionals during M.C.'s kindergarten and first grade school years; and the tests administered during M.C.'s kindergarten and first grade school years noted above. The IEP that was developed provided M.C. with special education services to address her reading,

---

[15] As discussed below, the test was again administered to M.C. by the private psychologist hired by the Parents in the summer of 2008.

math, and study skills. It reclassified her from a student with an "other health impairment" to a student with a "learning disability" due to her deficit in cognitive fluency. Fifteen goals were created for the 2008-2009 school year in the areas of study skills, writing, math, and motor skills. The IEP also provided for, among other things, participation in a general education program for the second grade, a thirty-minute session of occupational therapy once a week, a thirty-minute session of speech-language consultation once a month, a thirty-minute session of reading instruction three times a week, and access to an FM system, which it required Katonah's speech-language pathologist to monitor on a monthly basis. (See Joint Ex. 1B, at 15-22.)

### g. Private Speech-Language Pathologist Assessment

On May 21, 2008, the Parents took M.C. for re-evaluation by the private speech-language pathologist. This evaluation occurred *after* Katonah's Committee on Special Education met and developed M.C.'s 2008-2009 IEP.

*May 21, 2008 Illinois Test of Psycholinguistic Abilities–Third Edition*

The private speech-language pathologist re-administered the Illinois Test of Psycholinguistic Abilities, a test that she previously administered to M.C. in September 2006. The May 21, 2008 test revealed that M.C. ranked in the 58th percentile in spoken language; the 27th percentile in general language; and the 8th percentile in written language. (See id. at 49.)

*Lindamood Auditory Conceptualization Test*

The private speech-language pathologist also administered the Lindamood Auditory Conceptualization test. The results revealed that M.C. met "the minimum score for first half of 2nd grade." (Id. at 48). The speech-language pathologist noted that M.C. "hear[d] sounds, correctly represent[ed] them and order[ed] them in highly controlled phoneme segmentation tasks." (Id.)

*Test of Language Competence–Expanded Edition*

The private speech-language pathologist also administered the Test of Language Competence to M.C. The results revealed that M.C. ranked in the 87th percentile in the test's composite score (which included listening comprehension, ambiguous sentences, oral expression, and figurative language), and between the 58th and 84th percentiles in certain sub-tests. The speech-language pathologist noted that M.C.'s scores were within the "average," "high average" and "high end average" ranges. However, she still recommended speech-language therapy. (See id. at 48-52.)

**h. Private Psychologist Examination**

The Parents also had M.C. evaluated by a private psychologist between May 23, 2008 and July 31, 2008. This evaluation occurred *after* Katonah's Committee on Special Education convened and developed M.C.'s 2008-2009 IEP.

*Wechsler Intelligence Scale for Children–Fourth Edition*

The results of the Wechsler Intelligence Scale for Children revealed that M.C. ranked in the 82nd percentile for verbal comprehension intelligence; the 50th percentile for perceptual reasoning intelligence; the 47th percentile for full scale IQ; the 34th percentile for working memory intelligence; and the 7th percentile for processing speed intelligence. The psychologist noted that M.C.'s scores fell within the "average" or "high average" range for all but processing speed, which she identified as "borderline." (See id. at 59.)

*Kaufman Assessment Battery for Children–Second Edition*

The results of the Kaufman Assessment Battery for Children revealed that M.C. ranked in the 50th percentile in number recall, word order, and sequential processing; the 25th percentile in gestalt closure, rover, atlantis, rebus, simultaneous processing, and learning; and the

16th percentile in triangles. (See id. at 64.)

*Nepsy-Developmental Neuropsychological Assessment*

The results of the Nepsy-Developmental Neuropsychological Assessment revealed that M.C. ranked in the 75th percentile in memory for faces and narrative memory; the 50th percentile in phonological processing and visuomotor precision; and the 25th percentile in tower and knock and tap. (See id. at 65.)

*Naglieri Non-Verbal Ability Test*

The results of the Naglieri Non-Verbal Ability Test revealed that M.C. ranked in the 50th percentile. (See id.)

*Test of Pragmatic Language*

The results of the Test of Pragmatic Language revealed that M.C. ranked in the 18th percentile, which the psychologist indicated was "below average." (Id.)

*Comprehensive Assessment of Spoken Language*

The results of the Comprehensive Assessment of Spoken Language revealed that M.C. ranked in the 27th percentile in syntax construction and verbal concepts, and the 25th percentile in sentence completion and antonyms. (See id.)

*Summer 2008 Comprehensive Test of Phonological Processing*

The private psychologist also administered to M.C. the Comprehensive Test of Phonological Processing, a test that was previously administered to M.C. by the private speech-language pathologist hired by the Parents in September 2006, and again by Katonah's speech-language pathologist in April 2008. The results revealed that M.C. ranked in the 100th percentile in phonological awareness; the 35th percentile in phonological memory; and the 27th percentile in rapid naming. (See id. at 66.)

*Summer 2008 Wechsler Individual Achievement Test*

The private psychologist also re-administered the Wechsler Individual Achievement Test, a test that was previously administered to M.C. by Katonah's educational evaluator in January 2007, and again by Katonah's resource room teacher and reading specialist in January and April 2008. The results revealed that M.C. ranked in the 21st percentile in word reading; the 6th percentile in numerical operations; the 47th percentile in math reasoning; and the 45th percentile in spelling. (See id. at 69; see also Tr., at 2612-15.)

*Private Psychologist Conclusions*

Among other things, the psychologist concluded that M.C. would "be unable to handle the Second Grade curriculum in a traditional classroom setting," and recommended "intensive remedial support . . . in an individual or small group setting with a learning specialist certified in special education methodology." (Joint Ex. 1B, at 77.) She also recommended use of the "Orton-Gillingham" reading technique, as well as classroom accommodations that "are in place at Windward" in order to reduce background noise. (See id. at 77, 79.)

**i. The Parents' Rejection of 2008-2009 IEP**

By letter dated June 2, 2008, the Parents rejected the proposed goals in the 2008-2009 IEP on the grounds they were "not individualized, lack[ed] basis in scientific research, and fail[ed] to consider peer reviewed materials." (Id. at 24.) By letter dated July 10, 2008, the Parents rejected the proposed goals again, and stated the proposed 2008-2009 IEP "lack[ed] suitable writing goals, neglect[ed] decoding & encoding strategies, overlook[ed] objectives for increasing sight vocabulary, disregard[ed] speech and language objectives, and omit[ted] adequate procedures for measuring goals." (Id. at 26.)

**3. *Windward***

The Parents sent M.C. to Windward for her 2008-2009 second grade school year. Among the Parents' Exhibits are several reports documenting M.C.'s progress at that school. (See generally Parents' Exs.) As discussed below, I do not reach issues relating to M.C.'s progress at Windward or to the appropriateness of this private placement.

## B. Relevant Procedural History

### 1. *Proceedings Before the IHO*

By Due Process Complaint dated September 29, 2008, the Parents rejected the 2008-2009 IEP and demanded an impartial hearing on the ground that the IEP failed to provide M.C. with a FAPE. (See Joint Ex. 1B, at 1-13.) The Parents alleged, *inter alia*, that Katonah "historically failed" to provide M.C. with a FAPE, which resulted in her academic regression. (Id. at 5.) They asserted that M.C.'s regression was evident from a comparison of the test scores administered, including those tests which had not yet been administered at the time Katonah's Committee on Special Education met in 2008. They also alleged that Windward was appropriate, and they demanded tuition reimbursement, costs for the private evaluations, and attorneys' fees. (See id. at 7, 10-12.) Katonah's response denied the Parents' allegations in full. (See Joint Ex. 2, at 1-5.)

A hearing was conducted over the course of seventeen days in 2009. Eleven witnesses testified, including the Parents; the family's former nanny; the private psychologist and audiologist who evaluated M.C.; and Katonah's psychologist, speech-language pathologist, reading specialist, resource room teacher, first grade teacher, and second grade teacher. (See IHO Decision, at 1.) The IHO concluded that Katonah failed to provide M.C. with an appropriate education. First, the IHO determined that M.C. did not progress during the 2007-2008 academic year. In particular, she noted that a test administered by the private psychologist

in July 2008 showed that, when compared to her same-aged peers, M.C.'s percentiles decreased from January 2008. (See id. at 55.) Second, the IHO accepted the opinion of the private psychologist and found that the reading program utilized by Katonah was inappropriate for a child with dyslexia; that M.C. could not progress if she were placed in a general education classroom; and that M.C. required a class with a small student-to-teacher ratio, special education teachers, multi-sensory instruction, and reading supports integrated into the entire curricula. (See id. at 55-57.) Third, the IHO concluded that the program provided to M.C. during the 2007-2008 school year resulted in a widening gap between M.C.'s testing percentiles and those of M.C.'s same-age peers. She reasoned that M.C. "would fall further behind" her peers if she were not provided with appropriate "special education reading services." (Id. at 55; see id. (emphasis in original) ("[w]hen compared to the rate of learning of an average student, [M.C.] fell *below average* and remained there, and the gap between [M.C.] and her peers increased").)

Fourth, the IHO concluded that each IEP developed for M.C. was inappropriate. Specifically, she determined that Katonah failed to identify M.C.'s dyslexia and so failed to design an IEP that adequately addressed this learning disability. She also determined that the IEP developed for M.C.'s 2008-2009 school year was largely the same in substance to the inappropriate IEP developed for the previous school year. (See id. at 57-58.) Fifth, the IHO noted that the private audiologist opined that a personal FM device should have been utilized, and concluded that Katonah's failure to provide M.C. with the specific device recommended by the audiologist resulted in M.C.'s inability to hear in the classroom. (See id. at 58.) The IHO concluded,

> There can be no dispute that the programs offered by K[atonah] failed [M.C.]. Whatever K[atonah] was doing, K[atonah] was not giving [M.C.] the tools and the ability to bring what [M.C.] was learning in the reading programs into

> academic and non-academic areas outside the reading program. [M.C.] needed the ability to read, a special education program which would provide her with the tools she needed, and the ability to generalize so as to bring what she learned in the special education reading program in her academic subjects and everyday life. K[atonah]'s program did not allow [M.C.] to do this. The fact that K[atonah] merely repeated the same program that it had offered [M.C.] in the past indicates that K[atonah] failed to offer [M.C.] a FAPE which would provide [M.C.] with a meaningful benefit and the ability to read and utilize that ability outside the reading classroom.

(Id. at 57.)[16]

### 2. *Appeal to the SRO*

Katonah appealed the IHO's decision. The SRO reviewed the record developed at the IHO hearing and, on October 26, 2009, issued his 26 page, single-spaced decision. The SRO sustained Katonah's appeal and ordered that the IHO's decision be annulled. (See SRO Decision, at 26.) First, the SRO noted that the IHO did not address the Parents' contention that the 2008-2009 IEP contained annual goals that did not comport with M.C.'s individual needs. The SRO considered the issue and rejected the Parents' contention. Specifically, he credited the testimony of Katonah's reading specialist and found that the IEP's reading goals adequately corresponded with M.C.'s test results. He also found that the other goals were appropriate and addressed M.C.'s needs as indicated by her test results. (See id. at 17-18.) Second, the SRO reviewed the testimony by Katonah's second grade teacher and determined that her general education class would have sufficiently integrated the special education needs and services M.C. required and her IEP provided. (See id. at 18-19, 24-25.) Third, the SRO compared the 2006-2007, 2007-2008, and 2008-2009 IEPs and rejected the IHO's finding that they were essentially the same. He also reviewed the test results and hearing testimony and determined that M.C. had

[16] The IHO also determined that Windward was an appropriate school and that equitable considerations favored tuition reimbursement. (See IHO Decision, at 58-62.)

in fact made progress during her kindergarten and first grade years. He therefore rejected the SRO's conclusion that the IEPs were inappropriate to meet M.C.'s needs. (See id. at 19-25.) Fourth, he rejected the IHO's contention that M.C. did not make progress because "the gap" between her and her same-aged peers did not close. Specifically, the SRO noted that "comparing [M.C.'s] rate of progress to that of general education peers is not dispositive of whether she was offered a FAPE, or whether she previously demonstrated adequate progress." (Id. at 23 (internal citations omitted).) Finally, he reviewed the hearing testimony regarding M.C.'s assistive technology needs and rejected the IHO's determination that the device used by Katonah was inadequate and inappropriate for M.C. (See id. at 25.)[17]

### 3. *Federal Court Proceedings*

Plaintiffs now seek federal review pursuant to 20 U.S.C. § 1415(i)(2) and challenge the 2008-2009 IEP. Specifically, they argue that Katonah failed to provide M.C. with a FAPE, that Windward is appropriate, and that equitable considerations favor reimbursement. (See Mem. of Law in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem.") (Dkt. 16).) Katonah disputes Plaintiffs' arguments in full. (See Def.'s Mem. of Law in Supp. of Def.'s Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Mem.") (Dkt. 22).) The parties have submitted written memoranda and the Court heard oral argument on December 19, 2011.

## III. DISCUSSION

### A. IDEA

The IDEA was enacted in order "to ensure that all children with disabilities have

---

[17] Because the SRO determined that Katonah provided M.C. with a FAPE for the 2008-2009 school year, he did not consider whether Windward was appropriate or whether equitable considerations favored tuition reimbursement. (See SRO Decision, at 25.)

available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). States who receive federal funding under the IDEA must provide "free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21." Id. § 1412(a)(1)(A). A FAPE includes both special education and related services designed to meet a disabled student's individual and unique needs. See id. § 1414(d). To this end, the IDEA requires the school district to create a written IEP annually for each such student. See id. § 1414(d)(1)(A)(i). The IEP must describe the child's present levels of achievement and performance, the child's measurable goals, and the special education and other related services that, when provided, will enable the child to make progress toward those goals. See id.

The IDEA provides parents or guardians with procedures by which they may challenge an IEP as failing to provide a FAPE. After a written complaint is filed, the parent or guardian may request an impartial due process hearing before an IHO. See id. § 1415(f); N.Y. Educ. Law § 4404(1). The IHO's administrative decision may then be appealed. See 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2). Further review may then be sought in either a state court of competent jurisdiction or in a federal district court. See 20 U.S.C. § 1415(i)(2); N.Y. Educ. Law § 4404(3).

In federal court, a motion for summary judgment under the IDEA "is in substance an appeal from an administrative determination, not a summary judgment." Lillbask *ex rel.* Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (quoting Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995)). As such, it "involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for

reviewing administrative decisions." T.P. *ex rel.* S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (quoting Lillbask, 397 F.3d at 83 n.3). A federal court reviewing the administrative decision "shall receive the records of the administrative proceedings; . . . shall hear additional evidence at the request of a party; and . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); see Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003).

When deciding a motion for summary judgment under the IDEA, a federal court must undertake "what has been characterized as modified *de novo* review." M.R. *ex rel.* S.T. v. S. Orangetown Cent. Sch. Dist., No. 10-cv-1800, 2011 WL 6307563, at *6 (S.D.N.Y. Dec. 16, 2011) (internal quotation marks omitted). The court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited." Id. (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 205-06 (1982); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998)). The court's independent review "is by no means an invitation . . . to substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Rowley, 458 U.S. at 206. However, the court may "not simply rubber stamp administrative decisions." Walczak, 142 F.3d at 129. Rather, it "must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Grim, 346 F.3d at 380 (quoting Walczak, 142 F.3d at 129); see also, e.g., P. *ex rel.* Mr. & Mrs. P. v. Newington Bd. of Educ., 546 F.3d 111, 118 (2d Cir. 2008) (quoting Walczak, 142 F.3d at 129) ("Although school officials' decisions are subject to

'independent' judicial review, the 'responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers.'").

"Where there is disagreement between the IHO and the SRO, even in part, a court must give due weight to the factual conclusions of the SRO as the final word of the state authorities." J.G. *ex rel.* N.G. v. Kiryas Joel Union Free Sch. Dist., 777 F. Supp. 2d 606, 637 (S.D.N.Y. 2011) (citing Karl *ex rel.* Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist., 736 F.2d 873, 877 (2d Cir. 1984)); see also, e.g., A.C. *ex rel.* M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Karl, 736 F.2d at 877) (federal court must "'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer'"). Such deference is particularly appropriate where the SRO's "review has been thorough and careful." Walczak, 142 F.3d at 129.

Where parents or guardians believe that a school district failed to provide their child with a FAPE, they may "enroll the child in a private . . . school," and thereafter seek tuition reimbursement from the school district. 20 U.S.C. § 1412(a)(10)(C)(ii). Reimbursement, however, will only be required if (1) the services offered by the school district were inadequate or inappropriate, (2) the services provided by the private school were appropriate, and (3) equitable considerations support the parents' claim (hereinafter, the "Burlington Test"). Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369-70 (1985). "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." Schaffer *ex rel.* Schaffer v. Weast, 546 U.S. 49, 57-58 (2005); see Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 195 (2d Cir. 2005) (quoting Walczak, 142 F.3d at 130) ("[i]n order to avoid 'impermissibly meddling in state educational methodology,' a district court 'must

examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan'"); see also, e.g., S. Orangetown, 2011 WL 6307563, at *11 (plaintiffs failed to meet their burden to show that the student would have regressed or would not have received educational benefits). With respect to the first prong of the Burlington Test,

> The parents can satisfy their burden of proving that the district's plan did not afford their child a FAPE by establishing either (1) that the state did not comply with the procedural requirements of IDEA; or (2) that the challenged IEP was not "reasonably calculated to enable the child to receive educational benefits."

Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007) (quoting Rowley, 458 U.S. at 207).

**B. Analysis**

**1. Burlington *Test: First Prong***

Plaintiffs argue the 2008-2009 IEP was substantively inadequate because it was essentially the same as the IEP devised for the 2007-2008 year, a year during which they contend M.C. failed to progress. They also argue the 2008-2009 IEP was substantively inadequate because it did not address M.C.'s individual needs for a special education teacher and/or program, an appropriate reading program, a small classroom, and assistive technology. They further argue the IEP failed to include individualized and appropriate goals. Finally, Plaintiffs argue no deference should be given to the SRO's decision because the SRO is biased in favor of school districts.

Where an IEP is substantively, rather than procedurally, challenged, the parents or guardians must show that the school district failed to devise a plan "that is 'likely to produce progress, not regression,'" and which fails to "afford[ ] the student with an opportunity greater

than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130). An IEP will be reasonably calculated to enable a child to make such progress where it provides for "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203. Accordingly, a school district is not required to devise an IEP "that provides everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 132 (quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 (2d Cir. 1989)).

**a. Progress During the 2006-2007 and 2007-2008 School Years**

Plaintiffs argue that M.C. failed to meaningfully progress while a student in Katonah. Relying on selected test scores and witness testimony at the hearing, Plaintiffs contend that the evidence shows a "gap" between M.C. and her same-aged peers, and that the gap widened while M.C. was in Katonah. Plaintiffs also assert that the SRO improperly failed to consider certain test results and witness testimony regarding tests that were administered *after* the Committee on Special Education convened and developed M.C.'s 2008-2009 IEP. (See, e.g., Pls.' Mem., at 6-7, 12-15, 17; Pls.' Reply, at 8-10, 12-24; Pls.' Sur Reply to Def.'s Mem. of Law in Further Supp. of Def.'s Cross-Mot. for Summ. J., at 1-3 (Dkt. 37).) Defendant argues, *inter alia*, that the IHO erred by relying on such *ex post facto* information and that, in any event, M.C. made meaningful progress while in Katonah. (See Def.'s Mem., at 5-6, 13-21.)

First, I note that courts within this Circuit "have held that the inquiry into whether a particular IEP is 'reasonably calculated' to confer a meaningful educational benefit on a particular student must be made prospectively." S. Orangetown, 2011 WL 6307563, at *10; see also Kiryas Joel, 777 F. Supp. 2d at 636 n.26 (noting lack of Second Circuit precedent but ultimately reviewing only the information known to the Committee on Special Education at the

time the IEP was developed in order to reach "the most equitable result"); J.R. *ex rel.* S.R. v. Bd. of Educ. of City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004) (holding that determination of whether an IEP is reasonably calculated to deliver educational benefits "is necessarily prospective in nature" and therefore considering only the information known "at the time [the IEP] was devised"); cf. D.F. *ex rel.* N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598-99 (2d Cir. 2005) (declining to decide whether retrospective evidence is properly considered in determining substantive validity of IEP, but noting that other circuits have held such consideration is improper). Accordingly, I reject any suggestion that the SRO erred in declining to consider evidence developed after the 2008-2009 IEP was devised.

Even if tests administered after the 2008-2009 IEP was devised are taken into consideration, however, the record nonetheless supports the SRO's conclusion that M.C. made progress during her years at the public school. (See SRO Decision, at 19-23.) It is well-established that where an SRO has evaluated the evidence presented by both sides and made a reasoned judgment, this Court may not second-guess that decision. See Grim, 346 F.3d at 382-383. In this case, the SRO specifically noted test results which demonstrated M.C.'s increasing mastery of knowledge of upper and lowercase letters, sight words, and letter sounds, as well as her progressing reading levels. (See SRO Decision, at 20-23.) This objective evidence of M.C.'s progress was appropriately relied upon by the SRO, whose reasoned interpretation is entitled to deference.

Plaintiffs argue that the SRO improperly ignored other test results which reflect a lack of progress. Specifically, they contend that a comparison of M.C.'s results upon successive administrations of the Clinical Evaluation of Language Fundamentals test – which showed that the child's percentile rank dropped in one area, remained level in some areas, and rose in others

– indicates she regressed or otherwise did not make meaningful progress during her time in Katonah. (See Pls.' Reply, at 16.) Plaintiffs also argue that the results of the Comprehensive Test of Phonological Processing – which showed that M.C.'s percentile rank increased in every category over time – revealed only "little improvement" because M.C. "remained in the low end average" range when compared with her same-age peers. (Id. at 15 (emphasis omitted).) Finally, Plaintiffs argue that the results of the Wechsler Individual Achievement Test – which showed that M.C.'s percentile rank dropped in several areas – showed regression because the "gap between [M.C.'s] intelligence and her academic abilities was widening," which resulted in "about [a] one year delay[ ] in most academic subjects on average," and her inability to "keep[ ] pace with her peers." (Id. at 15.)

Plaintiffs would have this Court measure M.C.'s progress by comparing her test results to the mean average of the educational abilities of children her age. This approach misconstrues the purpose of the IDEA. It is clear that "a child's academic progress must be viewed in light of the limitations imposed by the child's disability." Mrs. B. *ex rel.* M.M. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir. 1997) (citing Rowley, 458 U.S. at 202 ("It is clear that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between.")). Accordingly, "[w]hen measuring [a child's] educational achievement, [the child] should not be compared to a nondisabled child." Mavis v. Sobol, 839 F. Supp. 968, 989 (N.D.N.Y. 1993); see also, e.g., Antignano *ex rel.* R.A. v. Wantagh Union Free Sch. Dist., No. 07-cv-2540, 2010 WL 55908, at *3 (E.D.N.Y. Jan. 4, 2010) (although test scores indicated "a lack of progress in closing the gap between her reading level and the reading level of average children her age," school district nonetheless provided the child a FAPE); Mather v. Hartford Sch. Dist., 928 F. Supp. 437, 446-

447 (D. Vt. 1996) (rejecting contention that "gap" between student's achievement and his grade level demonstrated lack of progress). Thus, for example, although M.C. may not have learned to read at the same *rate* or as *quickly* as the average first grader or as the majority of her non-disabled peers did, this does not mean that she did not learn to read and did not meaningfully progress in light of her limitations. As the SRO noted, the record reveals that M.C. finished first grade at a reading level statistically lower than a majority of her non-disabled peers. However, the record also shows that she improved in her reading and other skills.[18] It is well-established that the "IDEA does not require states to *maximize* the potential of disabled children; it is required only 'to open the door of public education to handicapped children on appropriate terms,' not 'to guarantee any particular level of education once inside.'" W.S. *ex rel.* C.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 138-39 (S.D.N.Y. 2006) (quoting Walczak, 142 F.3d at 139) (emphasis added). The Parents are clearly loving parents who want their child to succeed as much as possible. However, the IDEA does not require that a disabled child be provided an education that eventually enables her to perform with average or above-average scores. Accordingly, as the SRO found, even if the 2007-2008 and 2008-2009 IEPs were similar, M.C. made clear progress during her years at Katonah. Because her previous IEPs provided her access to a meaningful educational benefit, there is no reason to believe that a similar IEP would not continue to do so. Accordingly, this Court cannot conclude that Katonah failed to provide M.C. with a FAPE on this basis.

**b. 2008-2009 IEP and M.C.'s Individualized Needs**

---

[18] To the extent Plaintiffs express concern that M.C. was not becoming an "independent" reader, (see, e.g., Pls.' Reply, at 21), I note that her DRA assessments, as described above, show that she progressed from "level 2 independent" to "level 12 independent" while in first grade.

Plaintiffs argue the 2008-2009 IEP was inappropriate because it failed to address M.C.'s individual and unique needs for a special education teacher and/or special education program, an appropriate reading program, a small classroom, and assistive technology. They further argue the goals listed in the 2008-2009 IEP were not individualized to meet M.C.'s needs. For the reasons that follow, I find that Plaintiffs have failed to show that the 2008-2009 IEP was not reasonably calculated to provide M.C. with a FAPE on this basis.

First, Plaintiffs assert Katonah's use of the Wilsons Fundations reading technique was inappropriate because it was not specifically created for students with learning disabilities. They point to M.C.'s purported lack of progress while she was instructed with Fundations as evidence of the program's inadequacy. (See, e.g., Pls.' Mem., at 13-14; Pls.' Reply, at 8-10, 12-13, 24.) As noted above, I find that the record supports Katonah's contention that M.C. did make progress in her reading skills during her years in the District. To the extent Plaintiffs rely upon the witnesses who testified on their behalf during the IHO hearing, the SRO's agreement with the opinions of Katonah's experts is entitled to deference. (See SRO Decision, at 24 & n.32); see also W.S. *ex rel.* T.S. v. Nyack Union Free Sch. Dist., No. 09-cv-10139, 2011 WL 1332188, at *11 (S.D.N.Y. Mar. 30, 2011) (quoting Grim, 346 F.3d at 383) ("This Court is not permitted to choose 'between the views of conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.").

Plaintiffs argue the SRO's decision is not entitled to deference because he did not take into consideration the opinions of Plaintiffs' experts who interpreted tests that were administered after the 2008-2009 IEP was developed. (See, e.g., Pls.' Mem., at 7.) Even if this is true, Plaintiffs have not shown that the program used was inappropriate and failed to provide M.C.

with a FAPE. Again, the record indicates M.C. made progress during her kindergarten and first grade school years. Moreover, any contention that a different reading program or technique would have provided M.C. with a *better* education is, as noted above, beyond what the IDEA requires. See also Rowley, 458 U.S. at 197 n. 21 (rejecting contention that "'appropriate' education" requires school districts to "maximize the potential of handicapped children"); Antignano, 2010 WL 55908, at *13 (rejecting suggestion that a specific reading technique or program is necessary for school district to provide a student with a FAPE).

Second, Plaintiffs assert M.C.'s individual needs required that she be instructed by a teacher certified in special education and/or with programs and services specifically designed for special education students, as well as placement in a class with a small student-teacher ratio. Once again, Plaintiffs argue that the inappropriateness of Katonah's general education programs is evident from M.C.'s lack of progression. (See, e.g., Pls.' Mem., at 9-15; Pls.' Reply, at 8-9, 18, 21-22.) I reject this argument for the reasons discussed above. To the extent Plaintiffs rely upon the opinions of their experts that M.C. required "special education," once again I conclude that the SRO's agreement with Katonah's experts is entitled to deference. Moreover, I note that "[t]here is no obligation under the IDEA for a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities." Straube v. Florida Union Free Sch. Dist., 801 F. Supp. 1164, 1176 (S.D.N.Y. 1992); see also, e.g., A.E. *ex rel.* Mr. & Mrs. E. v. Westport Bd. of Educ., 463 F. Supp. 2d 208, 221 (D. Conn. 2006) (although a child may benefit from a smaller sized class, the IDEA "requires only that a school board provide each student a FAPE, that is, a basic opportunity to receive an educational benefit"). Here, the 2008-2009 IEP provided for resource room, occupational therapy, and reading intervention; even if this program was similar to the previous years' IEPs, those IEPs

enabled M.C. to receive meaningful educational benefits and make progress. In addition, I note that the IDEA contains a clear mandate that school districts must strive to mainstream disabled children in the "least restrictive environment" possible. 20 U.S.C. § 1412(a)(5)(A). It was therefore not inappropriate for Katonah to devise an IEP that continued to educate M.C. in a general education classroom and provide her with additional support services as required. See K.L.A. v. Windham Se. Supervisory Union, 371 F. App'x 151, 155 (2d Cir. 2010).

Third, Plaintiffs assert the 2008-2009 IEP inadequately addressed M.C.'s individual needs for assistive technology. They point to the fact that the IEP specified a "Radium" broadcast system instead of the individual "Phonak" system recommended by the private audiologist.[19] They also point to M.C.'s lack of progress to show that the system employed was inadequate. (See, e.g., Pls.' Mem., at 10-13, 16; Pls.' Reply, at 11-12.) However, as noted above, the IDEA does not require "a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities." Straube, 801 F. Supp. 2d at 1176; see also A.H. *ex rel.* J.H. v. Dep't of Educ. of N.Y.C., 394 F. App'x 718, 721 (2d Cir. 2010) (quoting Rowley, 458 U.S. at 199) (the "IDEA does not require that an IEP furnish 'every special service necessary to maximize each handicapped child's potential'").

---

[19] Plaintiffs also appear to argue Katonah's speech-language pathologist did not have the "lawful right to change the orders" of the private audiologist by utilizing a different type of FM system in the classroom. (Pls.' Mem., at 11; see also Pls.' Reply, at 1, 11; Tr., at 3212-13.) This argument is puzzling for several reasons. First, the record reveals that it was Katonah's Committee on Special Education – of which the speech-language pathologist was a member – that made the decisions regarding which assistive technology devices to use. (See, e.g., Tr., at 194-95.) Second, the audiologist's evaluation merely "recommend[ed]" that M.C. utilize a wearable FM system with receivers for each ear. (Joint Ex. 1B, at 2.) Third, Plaintiffs provide no authority for their contention that a private audiologist may dictate which products a public school district purchases and uses.

Here, Katonah specified a broadcast FM system rather than the personal system recommended by the audiologist. (See Tr., at 124-25, 192-201.)[20] However, a school district does not fail to provide a child with a FAPE where it employs a different assistive technology device than the model the family prefers, so long as the device employed is reasonably calculated to allow the child to receive educational benefits. See, e.g., Sherman v. Mamaroneck Union Free Sch. Dist., 340 F.3d 87, 93-94 (2d Cir. 2003) (school district entitled to provide the assistive technology it deems reasonably calculated to enable child to receive educational benefit, not simply the technology requested). Plaintiffs provide no evidence to suggest that the system utilized by Katonah did not function or was otherwise inadequate. To the contrary, the record supports the view that M.C. progressed while in Katonah.[21]

Finally, Plaintiffs assert the 2008-2009 IEP was inadequate because it failed to include appropriate goals for M.C. They argue this inadequacy is evident by the fact that the goals listed in 2007-2008 and 2008-2009 IEPs were the same, and that no goals addressed M.C.'s cognitive fluency deficiency. (See, e.g., Pls.' Mem., at 10, 16-17; Pls.' Reply, at 9-10.) In addition, Plaintiffs's reply brief points to arguments raised by the Parents in their letters to Katonah rejecting the 2008-2009 IEP. (See Pls.' Reply, at 17.) In those letters, the Parents argued, *inter alia*, that the goals lacked "any basis in scientific research," failed "to consider peer reviewed

---

[20] In addition, as noted by the SRO, the record reveals that Katonah provided a personal receiver system to M.C. in an earlier year, but the experiment was not successful. (See Tr., at 125, 193 (M.C. played with the earbuds and pulled them out of her ears).)

[21] The record reflects that a working FM system was not available to M.C. for some period of time in or around November 2007 due to technical problems involving another student's device. (See Tr., at 124-25, 197.) However, Plaintiffs fail to show that this precluded M.C. from receiving educational benefits. See, e.g., D.D-S. v. Southold Union Free Sch. Dist., No. 09-cv-5026, 2011 WL 3919040, at *13 (E.D.N.Y. Sept. 2, 2011) (*de minimis* failure to implement FM system does not deprive student of FAPE).

materials," (Joint Ex. 1B, at 24), did not sufficiently address M.C.'s writing needs, lacked "decoding & encoding strategies," did not address M.C.'s "sight vocabulary," omitted "speech and language objectives," and failed to identify how progress toward the goals would be measured, (id. at 26).

Plaintiffs are simply wrong in their contention that the goals listed in the 2007-2008 and 2008-2009 IEPs were identical. (Compare Dist. Ex. 1, at 6-8, with Dist. Ex. 2, at 5-6.) The record also reflects that during the May 2008 Committee on Special Education meeting, numerous witnesses presented the Committee with evidence concerning M.C.'s progress, strengths, weaknesses, and needs. This information was incorporated into the IEP, and fifteen personal annual goals were developed. In particular, I note that the IEP reflected that, academically, M.C. had a deficiency in cognitive fluency, and that her decoding and written expression skills scored in the average range. Three specific goals were developed to address reading, decoding, and fluency issues.[22] The IEP also addressed M.C.'s writing needs.[23] In addition, each of the fifteen goals identified the person responsible for measuring the goal, as well as the manner in which the goal would be measured. Finally, I note that Plaintiffs are correct in their assertion that the IEP did not contain services or goals in the area of speech-language. However, the record reveals that M.C. tested in the "average to superior" range in these areas and did not require such intervention. (See Joint Ex. 1B, at 17-22.)

---

[22] Specifically, the goals (1) aimed for M.C. to read material written at a second grade level, and with correct expression and appropriate fluency; (2) aimed for M.C. to process information her teachers read out loud, comprehend that information, and orally answer questions about it; and (3) aimed for M.C. to read material herself, process the information, restate the information, and orally describe its main ideas. (See Joint Ex. 1B, at 21.)

[23] Specifically, the goal aimed for M.C. to use capital letters and punctuation appropriately. (See Joint Ex. 1B, at 21.)

To the extent that Plaintiffs dispute the second grade reading level goal, (see, e.g., Pls.' Reply, at 17-18), I simply note that this was an annual goal – something that M.C. was to aim for throughout second grade. The SRO did not adopt Plaintiffs' concern that M.C. would be provided materials she was not yet able to read. Rather, he agreed with Katonah's witnesses who opined that the additional reading support services given to M.C. would enable her to reach this goal in time. The appropriateness of this methodology is precisely the kind of area in which a state agency's expertise requires deference by a federal court. See Grim, 346 F.3d at 382 ("the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers").

Finally, Plaintiffs have not shown that the goals were inappropriate because they were not based on "scientific research" or "peer reviewed materials." They have not identified which goal(s) were allegedly deficient in this respect, and have not explained why such bases were necessary for M.C.'s IEP. See Straube, 801 F. Supp. at 1176 (IDEA does not require "a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities").

Accordingly, Plaintiffs have not established that Katonah failed to provide M.C. a FAPE.

**c. Bias of SRO**

Plaintiffs argue no deference should be afforded the SRO's decision because the SRO was biased in favor of school districts. In support of this argument, Plaintiffs point to an article from the Wall Street Journal which reported that the majority of his decisions were in favor of school districts. (See Pls.' Mem., at 31-32 & n.3.) They also claim that "former agency staff members" have criticized the SRO, that he engaged in "an ongoing romantic relationship with an assistant counsel for the New York State Education Department," and that other attorneys have

asked the New York State Legislature to amend laws to require that a panel of SROs – rather than just one – determine IDEA appeals. (Id. at 32.) Plaintiffs argue the SRO "should have recused himself based on bias, conflict of interest and lack of impartiality." (Id. at 33; see also Pls.' Reply, at 38.)

These arguments, based on inadmissible evidence, have been rejected repeatedly in this district. C.G. *ex rel.* B.G. v. N.Y.C. Dep't of Educ., 752 F. Supp. 2d 355, 360-61 (S.D.N.Y. 2010); W.T. & K.T. *ex rel.* J.T. v. Bd. of Educ. of Sch. Dist. of N.Y.C., 716 F. Supp. 2d 270, 283-86 (S.D.N.Y. 2010); see also, e.g., R.S. *ex rel.* A.S. v. Lakeland Cent. Sch. Dist., No. 09-cv-9874, 2011 WL 1198458, at *6 (S.D.N.Y. Mar. 30, 2011) (collecting cases); E.Z.-L. *ex rel.* R.L. v. N.Y.C. Dep't of Educ., 763 F. Supp. 2d 584, 595 n.7 (S.D.N.Y. 2011) (same). Accordingly, the SRO's decision is entitled to deference.

### 2. **Burlington** ***Test: Second and Third Prongs***

Because I have determined that the 2008-2009 IEP was appropriate, I need not address the second or third prongs of the Burlington Test. See Mamaroneck, 554 F.3d at 254.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment is **DENIED** and Katonah's cross-motion for summary judgment is **GRANTED**. The Clerk is respectfully directed to terminate the motions (Dkts. 15, 20) and close this case.

Dated: May 24, 2012
White Plains, New York

**SO ORDERED**

Paul E. Davison
United States Magistrate Judge
Southern District of New York